**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HILLER & ASSOCIATES, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 18-152-VAC-MPT |
| | : | |
| GARDEN FRESH | : | |
| RESTAURANTS, LLC, | : | |
| | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATION**

## I. INTRODUCTION

On January 28, 2018, Hiller & Associates ("plaintiff" or "Hiller") brought this action against Garden Fresh Restaurants, LLC ("defendant" or "Garden Fresh"), alleging breach of contract.[1] Defendant answered the Complaint on February 16, 2018, and alleges counterclaims for: breach of contract, fraudulent inducement, and negligent misrepresentation.[2]

Presently before the court is plaintiff's motion to dismiss defendant's counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6),[3] and defendant's motion to preclude D.I. 29, a declaration attached to plaintiff's reply brief on the motion to dismiss.[4] The court has jurisdiction under 28 U.S.C. § 1332, as the parties are residents of different states, and the amount in controversy exceeds $75,000.[5] For the reasons that follow, the court recommends that the district court grant plaintiff's motion to dismiss and deny as moot defendant's motion to preclude.

---

[1] D.I. 2.
[2] D.I. 14 at ¶ 26 at 15–¶ 48 at 17.
[3] D.I. 22.
[4] D.I. 34.
[5] D.I. 2 at ¶ 5 at 3. This court has personal jurisdiction over defendant, which is organized under Delaware law. *Id.* at ¶ 2 at 2. Venue is proper under 28 U.S.C. § 1391(b)(1).

## A. Background

### 1. Factual background

The following facts are alleged by Hiller in the Complaint or are included in documents attached to the Complaint.[6]

Garden Fresh is a Delaware limited liability company, with headquarters in California.[7] Garden Fresh "operates a chain of approximately 100 fast casual restaurants[.]"[8] In October 2016, Garden Fresh sought Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware.[9] In early 2017, as part of its exit from Chapter 11, Garden Fresh investigated the potential to negotiate a new beverage contract with Coca-Cola, its contracted soft-drink provider at the time.[10] At the time, the CEO of Garden Fresh was Mr. Gene Baldwin ("Baldwin").[11]

Hiller "is [] in the business of consulting restaurants in connection with the negotiation of beverage sales agreements with major soft drink suppliers[.]"[12] In March 2017, the parties signed a "Beverage Consulting Agreement" (the "Beverage Consulting Agreement").[13] The contract states in part:

RECITALS

Whereas, [Hiller] is engaged in the business of providing soft drink consulting services to customers; and

Whereas, the services provided by [Hiller] include an assessment of [Garden Fresh]'s current beverage program, and

---

[6] D.I. 2; D.I. 2-1, ex. A; D.I. 2-2, ex. B; D.I. 2-3, ex. C; D.I. 2-4, ex. D. Although defendant challenges the authenticity of documents attached to plaintiff's motion to dismiss, *e.g.* D.I. 26 at 5, defendant does not challenge the aforementioned exhibits A–D.

[7] *Id.* at ¶ 2 at 2.

[8] *Id.* at ¶ 4 at 2.

[9] *Id.* at ¶ 10 at 3.

[10] *Id.* at ¶ 11 at 4–¶ 12 at 4.

[11] *Id.* at ¶ 12 at 4.

[12] *Id.* at ¶ 1 at 2.

[13] D.I. 2-1, ex. A.

Whereas, [Garden Fresh] desires to utilize [Hiller]'s expertise and services with respect to establishing and/or modifying the soft drink program of [Garden Fresh]'s business.

Now, therefore, it is mutually agreed as follows:

SERVICES

[Garden Fresh] hereby grants [Hiller] the right and authority to provide expertise and services to support [Garden Fresh] in the establishment and/or modification of its soft drink program(s). [Garden Fresh] agrees to provide [Hiller] with all relevant information including, but not limited to, all information regarding [Garden Fresh]'s current soft drink products, any funding provided for said products, as well as support premiums, marketing programs, etc.

COMPENSATION

[Hiller] shall be paid for its services as follows (a) if a new Coke contract is chosen by [Garden Fresh], $65,000 in one-time fixed compensation plus discretionary bonus potential of up to $10,000 that is fully controlled by [Garden Fresh] OR (b) if [Garden Fresh] decides to accept a new agreement with Pepsi, variable compensation calculated at the rate of 20% of all improvement above the per gallon total deal value of [Garden Fresh]'s current Coke master beverage program ($6.24 per gallon) times the total contracted gallonage. The current total deal value and improvement in the new program total deal value shall include all contracted compensation including but not limited to marketing, meeting, equipment, service, early renewal, and any other contracted funding.[14]

Hiller claims that, prior to signing the contract, it obtained "detailed information from Garden Fresh regarding its beverage program with Coca-Cola, including historical and projected gallons of Coca-Cola product used at Garden Fresh's restaurants, historical and projected number of locations operated by Garden Fresh, and the dollar value of the funding that Coca-Cola had agreed to pay Garden Fresh."[15]

Specifically prior to signing the Beverage Consulting Agreement, in February 2017, Hiller alleges that it "conducted an analysis of the current and likely future value of

_____

[14] D.I. 2-1, ex. A at 1.
[15] D.I. 2 at ¶ 12 at 4.

Garden Fresh's current deal with Coca-Cola, which included an analysis of the projected number of gallons of Coca-Cola product that Garden Fresh was likely to use from 2018 to 2021."[16]  According to Hiller, Garden Fresh "confirmed [its] calculations."[17]

After signing the Beverage Consulting Agreement, Hiller "engaged both Pepsi and Coca-Cola in a competitive bid process."[18]  In April 2017, "Garden Fresh's executive team made the decision to move forward with Pepsi as their new beverage supplier."[19]

In May 2017, based upon the "historical and estimated figures provided to it by Garden Fresh[,]" Hiller negotiated a "deal in principle with Pepsi that would pay Garden Fresh at least 54% more 'funding' per gallon than Coca-Cola had paid Garden Fresh [in its prior contract], which represented millions of dollars of incremental revenue to Garden Fresh over the life of the agreement."[20]

In June 2017, facing a potential acquisition by a restaurant group with an established relationship with Coca-Cola, Garden Fresh asked Hiller "to negotiate a deal-in-principle with Coca-Cola that would be signed if the acquisition occurred[.]"[21]  The Coca-Cola "proposal . . . had a total deal value that would have been approximately 28% less, on a dollars-per-gallon basis, than the agreement in principle that Hiller [] had negotiated with Pepsi, even though the proposed Coca-Cola agreement would have lasted twice as long[.]"[22]  The acquisition did not transpire, and Garden Fresh returned to its plans with Pepsi.[23]

---

[16] *Id.* at ¶ 13 at 4.
[17] *Id.* at ¶ 13 at 4.
[18] *Id.* at ¶ 18 at 5.
[19] *Id.*
[20] *Id.* at ¶ 19 at 5–6.
[21] *Id.* at ¶ 20 at 6.
[22] *Id.* at ¶ 20 at 6.
[23] *Id.* at ¶ 22 at 7.

Garden Fresh signed a beverage sales agreement with Pepsi in August 2017.[24] The agreement was substantially the same as the agreement-in-principle that Hiller had negotiated in May.[25] With the exception of Dr. Pepper,[26] Garden Fresh agreed to purchase soft drinks exclusively from Pepsi "[i]n exchange for substantial per gallon 'funding' and other pecuniary value paid by Pepsi[.]"[27] The term of the Pepsi deal is "at least five years or until Garden Fresh use[s] a specified number of gallons of 'post-mix products,' *i.e.*, fountain soft drink syrup, whichever [i]s longer."[28]

In determining the volume commitments to Pepsi, Hiller alleges that "[t]he specified number of syrup gallons in the Pepsi contract was calculated and agreed to by all parties involved and was based on gallonage information provided by Garden Fresh."[29] According to Hiller, the parties factored in "the closure of several Garden Fresh restaurants in 2016 and 2017 and [] the recent trend of Americans consuming fewer carbonated soft drinks."[30] As a result, in the Pepsi contract, Garden Fresh committed to a number of syrup gallons per year that was "over 10% lower than the average number of committed gallons per year in the final five years of Garden Fresh's prior Coca-Cola agreement."[31]

After Garden Fresh signed the Pepsi deal, Garden Fresh asked Hiller to submit an invoice and to agree to payment over six months.[32] Hiller agreed to the payment terms and submitted an invoice for $485,268 payable at $80,878 monthly.[33] Garden

---

[24] *Id.* at ¶ 23 at 7.
[25] *Id.*
[26] According to Garden Fresh's contract with Pepsi, Garden Fresh is allowed to sell Dr. Pepper in its restaurants. D.I. 23-6, ex. 6 at 2.
[27] D.I. 2 at ¶ 23 at 7.
[28] *Id.*
[29] *Id.* at ¶ 24 at 7.
[30] *Id.*
[31] *Id.*
[32] *Id.* at ¶ 26 at 8; D.I. 2-3, ex. C at 3 of 5.
[33] D.I. 2 at ¶ 26 at 8; D.I. 2-4, ex. D.

Fresh paid the first two monthly installments in August and September.[34]  During this time, Garden Fresh and Pepsi each contacted Hiller to raise issues with the conversion from Coca-Cola—Hiller agreed to work with Garden Fresh and Pepsi "to address some of these implementation issues."[35]  "During this same time period, Hiller [] also negotiated a separate agreement between Dr. Pepper and Garden Fresh for no additional compensation."[36]

In September 2017, Garden Fresh was sold to new owners who installed a new CEO, Mr. John W. Haywood ("Haywood").[37]  On September 13, 2017, Haywood approached Hiller to "discuss a renegotiation of [its] fee[]" and for the possibility that Hiller could "negotiate a potential 'exit' from the Pepsi agreement on Garden Fresh's behalf."[38]  Garden Fresh did not pay Hiller in October 2017 or thereafter.[39]  In response to subsequent requests by Hiller, Garden Fresh has refused to pay and has sought to renegotiate payments under the Beverage Consulting Agreement.[40]  Hiller filed the present action on January 26, 2018, alleging that Garden Fresh breached the contract between the parties by refusing to pay the money it allegedly owes Hiller.[41]

### (a)    Answer and Counterclaim

Defendant answered the Complaint on February 16, 2018.[42]  In the Answer, Defendant alleges counterclaims for:  breach of contract, fraudulent inducement, and negligent misrepresentation.[43]

---

[34] D.I. 2 at ¶ 28 at 9.
[35] *Id.* at ¶ 27 at 9.
[36] *Id.*
[37] *Id.* at ¶ 29 at 9–10.
[38] *Id.*
[39] *Id.* at ¶ 30 at 10.
[40] *Id.*
[41] D.I. 2.
[42] D.I. 14.
[43] D.I. 14 at ¶ 26 at 15–¶ 48 at 17.

### (i)     Counterclaims

Garden Fresh alleges the following in its Counterclaims.  Hiller allegedly represented in the Beverage Consulting Agreement that "the services it would provide would include 'an assessment of [Garden Fresh's] current beverage program.'"[44]  Based upon this representation, Garden Fresh contends that it "expected Hiller's assessment of Garden Fresh's soft drink program would include, at a minimum, a rigorous and careful examination and analysis . . . of the historic beverage data, as well as to include consideration of Garden Fresh's current and anticipated future needs, and market trends."[45]  Garden Fresh contends:

> Hiller could not, in good faith, negotiate a new beverage contract for Garden Fresh without first evaluating Garden Fresh's existing beverage program, considering how factors such as Garden Fresh's Dr. Pepper soft drink program would impact its overall soft drink needs, and ensuring that any gallon commitment figure in a Pepsi or Coca-Cola agreement accurately reflected Garden Fresh's needs over five years.[46]

Specifically, Garden Fresh alleges that Hiller did not "account for how Garden Fresh's Dr. Pepper usage would impact Garden Fresh's overall beverage program."[47]  Garden Fresh alleges that "Hiller rotely applied historical volume data that included Dr. Pepper product, as well as [Coke] product."[48]  As a result, Garden Fresh avers Hiller's deal for Garden Fresh paints far too rosy of a picture, because Hiller "overstated the amount of

---

[44] D.I. 14 at ¶ 8 at 12 (citing D.I. 2-1, ex. A at 1).

[45] *Id.* at ¶ 11 at 12.

[46] *Id.* at ¶ 12 at 13.

[47] *Id.* at ¶ 17 at 13.

[48] *Id.* at ¶ 18 at 13–14.  In the Answer and Counterclaims, Garden Fresh refers to "historical volume data" for "Pepsi product."  *Id.*  Garden Fresh did not have a relationship with Pepsi prior to the August 2017 contract; therefore, there would not be any historical volume data for Pepsi products.  The court concludes that this is an inadvertent error and that Garden Fresh intended to refer to historical data for "Coke product."

Pepsi syrup gallons Garden Fresh would require over the intended five-year life of the beverage sales agreement."[49]

Garden Fresh avers that, "[h]ad Hiller . . . [done] the contracted-for assessment and evaluation of the data and other information relating to Garden Fresh's beverage program, Hiller necessarily would have negotiated *a different Pepsi agreement* on behalf of Garden Fresh[.]"[50]

Garden Fresh alleges that it did not discover "Hiller's gallonage error [until] October 2017."[51] At approximately the same time, Hiller informed Garden Fresh that it "would no longer assist Garden Fresh with the Pepsi Contract or any additional negotiations with Pepsi[,]" and Garden Fresh "had to engage a new consultant to help renegotiate the flawed Pepsi Contract. . . [at] additional expense[.]"[52] As of February 16, 2018, Garden Fresh stated that "[t]he renegotiations are ongoing."[53]

As to breach of contract, Garden Fresh alleges that Hiller's failure to perform the assessment is material, and as a result Garden Fresh suffered damages in the $162,000 it paid Hiller as well as expectation damages.[54] Garden Fresh's claims for fraudulent inducement and negligent misrepresentation are also based on its allegations that Hiller represented that it would perform the "assessment" that Garden Fresh claims was either not done or was done improperly.[55]

### 2. Procedural background

Plaintiff moved to dismiss defendant's counterclaims on March 23, 2018 (the "motion to dismiss").[56] Attached to its opening brief in support of the motion to dismiss,

---

[49] *Id.*
[50] *Id.* at ¶ 19 at 14 (emphasis added).
[51] *Id.* at ¶ 22 at 14.
[52] *Id.* at ¶ 24 at 14.
[53] *Id.*
[54] *Id.* at ¶ 30 at 15.
[55] *Id.* at ¶ 33 at 16–¶ 48 at 17.
[56] D.I. 22.

are six documents, which plaintiff contends are described in the Complaint and the Counterclaims.[57]  Defendant opposes the motion to dismiss and argues that all six documents "are not authenticated and Garden Fresh's counterclaims are not based on those documents."[58]  In addition, defendant argues that the court should treat the motion to dismiss "as one for summary judgment under [Federal] Rule [of Civil Procedure] 12(d), as to arguments requiring consideration of the attached documents."[59]  Accompanying its reply brief,[60] plaintiff filed a Declaration by Mr. George C. Hiller authenticating the three undated documents—exhibits 3–5 (the "Hiller Declaration").[61]

On April 6, 2018, defendant moved to preclude the Hiller Declaration (the "motion to preclude") under Local Rule 7.1.3(c)(2), which proscribes new arguments in reply briefs.[62]  Plaintiff opposes the motion,[63] which was fully briefed on April 27, 2018.[64]

## II.    STANDARD OF REVIEW

### A.    Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) governs a motion to dismiss a complaint for failure to state a claim upon which relief can be granted.  The purpose of a motion under Rule 12(b)(6) is to test the sufficiency of the complaint, not to resolve disputed facts or decide the merits of the case.[65]  "The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the

---

[57] D.I. 23 at 3 n.1, 11.
[58] D.I. 26 at 5.
[59] *Id.*
[60] D.I. 28.
[61] D.I. 29.
[62] D.I. 34 at 1–2.
[63] D.I. 40.
[64] D.I. 43.
[65] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

claims."[66]  A motion to dismiss may be granted only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to the plaintiff, plaintiff is not entitled to relief."[67]  While the court draws all reasonable factual inferences in the light most favorable to a plaintiff, it rejects unsupported allegations, "bald assertions," and "legal conclusions."[68]

To survive a motion to dismiss, a plaintiff's factual allegations must be sufficient to "raise a right to relief above the speculative level . . . ."[69]  Plaintiffs are therefore required to provide the grounds of their entitlement to relief beyond mere labels and conclusions.[70]  Although heightened fact pleading is not required, "enough facts to state a claim to relief that is plausible on its face" must be alleged.[71]  A claim has facial plausibility when a plaintiff pleads factual content sufficient for the court to draw the

---

[66] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotations and citations omitted); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007) ("[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder.").

[67] *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (citing *Burlington*, 114 F.3d at 1420).

[68] *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (citations omitted); *see also Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) (citations omitted) (rejecting "unsupported conclusions and unwarranted inferences"); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983) ("It is not . . . proper to assume [plaintiff] can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged.").

[69] *Twombly*, 550 U.S. at 555 (citations omitted); *see also Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (citing *Twombly*, 550 U.S. at 555).

[70] *See Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

[71] *Twombly*, 550 U.S. at 570; *see also Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) ("In its general discussion, the Supreme Court explained that the concept of a 'showing' requires only notice of a claim and its grounds, and distinguished such a showing from 'a pleader's bare averment that he wants relief and is entitled to it.'") (quoting *Twombly*, 550 U.S. at 555 n.3).

reasonable inference that the defendant is liable for the misconduct alleged.[72]  Once stated adequately, a claim may be supported by showing any set of facts consistent with the allegations in the complaint.[73]  Courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record when reviewing a motion to dismiss.[74]

### B.    Motion to Preclude

Rule 7.1.3(c)(2) of this court's Local Rules states that "[t]he party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief."[75]  Sanctions may be imposed for violations of the local rules, "at the discretion of the Court, for violations of the Rules, as well as for violations of the Fed. R. Civ. P. and any order of the Court.  Such sanctions may include, but are not limited to, costs, fines and attorneys' fees imposed on the offending party and that party's attorney."[76]  "In addition . . . [the court may] determin[e] [] the motion against the offending party."[77]

## III.    DISCUSSION

Hiller argues, in its opposition to the motion to preclude, that "there are numerous bases on which to dismiss all of Garden Fresh's counterclaims that would not require the Court to consider the Assessment Documents at all, . . . [t]herefore, the Court has ample grounds to deny Garden Fresh's motion [to preclude] as moot."[78]  First, before the court addresses the motion to preclude, which is effectively exhibits 3–5, it addresses whether it may consider exhibits 1, 2, and 6.  Second, with those documents

---

[72] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).
[73] *Twombly*, 550 U.S. at 563 (citations omitted).
[74] *See, e.g., Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted).
[75] D. Del. LR 7.1.3.
[76] D. Del. LR 1.3.
[77] *Id.*
[78] D.I. 40 at 3.

in hand, the court next addresses the motion to dismiss.  Third, the court discusses the motion to preclude.

## A.    Exhibits 1, 2, and 6

As a preliminary matter, in its motion to preclude, Garden Fresh seeks to exclude the Hiller Declaration, which authenticates exhibits 3–5 attached to plaintiff's motion to dismiss.[79]  The Hiller Declaration does not discuss exhibits 1, 2, or 6, and Garden Fresh did not move to preclude these documents.[80]

Generally speaking, "a court may consider an undisputedly authentic document that a [moving party] attaches as an exhibit to a motion to dismiss if the [non-moving party]'s claims are based on the document."[81]  In the case at bar, Hiller argues that the court "may properly consider [these] documents in ruling on th[e] motion to dismiss[,]" because "[e]xhibits 1–2 and 6 . . . are described in the Complaint and the Counterclaims and are incorporated by reference therein."[82]  Garden Fresh does not dispute the authenticity of exhibits 1, 2, and 6.[83]

In addition, Garden Fresh's Counterclaims appear to be based, at least in part, on exhibits 1, 2, and 6.  For example, Garden Fresh alleges that it "provided Hiller with

---

[79] D.I. 34; D.I. 29 at¶¶ 2–5 (authenticating exhibits 3–5).

[80] D.I. 29; D.I. 34.

[81] *Pension Ben. Guar. Corp.*, 998 F.2d at 1196.

[82] D.I. 23 at 3 n.1.  For example, "[e]xhibits 1 and 2 . . . are emails between Hiller and Garden Fresh requesting and receiving information about Garden Fresh's Coca-Cola program, [and] are referenced in both the Complaint and the Counterclaims."  *Id.* (citing D.I. 2 at ¶ 12 at 4 (Complaint); D.I. 14 at ¶ 9 at 12 (Counterclaims)).  In addition, "[e]xhibit 6, which is the beverage sales agreement between Garden Fresh and Pepsi, is also referenced in both pleadings."  *Id.* (citing D.I. 2 at ¶23 at 7-¶ 25 at 8 (Complaint); D.I. 14 at ¶ 13 at 13 (Counterclaims)).

[83] D.I. 26 at 5 (disputing the authenticity of exhibits 3, 4, and 5, "in particular the emails and spreadsheets constituting Hiller's supposed 'assessment.'").  Moreover, Garden Fresh effectively conceded all opposition to exhibit 6 when it argued that its "claims arises out of the . . . beverage agreement Hiller negotiated with Pepsi."  *Id.*

open access to Garden Fresh's staff and to the company's historical beverage data[.]"[84] However, according to Garden Fresh, "Hiller overstated the amount of Pepsi syrup gallons Garden Fresh would require over the intended five-year life of the beverage sales agreement[,]"[85] and as a result, Garden Fresh "enter[ed] into a Pepsi contract with unfavorable terms, including a longer effective term and substantially reduced cost savings."[86]

Exhibit 1 is a series of e-mail exchanges from November 2016 and ending on January 23, 2017 with a request from Hiller to Garden Fresh for information relating to historical and estimated (for 2017) "Total <u>Garden Fresh</u> system Coke gallons[,]" the number of "system stores open (at the **end** of each year please)[,]" and other details.[87] Exhibit 2 is an e-mail exchange from Baldwin to Hiller forwarding an e-mail from Garden Fresh's Susan Miille Hoffman, Vice President of Fresh Sourcing and Menu Innovation, containing a series of documents responding to Hiller's request, including a spreadsheet entitled "Coke Information for CR3.xlsx[,]" which includes direct responses to each of Hiller's requests.[88] Thus, the court concludes that Garden Fresh's Counterclaims are based on exhibits 1 and 2, and the court may consider these documents in the motion to dismiss.

Similarly, Garden Fresh alleges in the Counterclaims that Hiller negotiated a contract between Garden Fresh and Pepsi, which reflected an "overstated [] amount of Pepsi syrup gallons Garden Fresh would require over the intended five-year life of the beverage sales agreement."[89] Exhibit 6, is a copy of this contract.[90] Therefore, Garden

---

[84] D.I. 14 at ¶ 9 at 12.  In the Answer, Garden Fresh denies that it provided Coca-Cola projections to Hiller.  D.I. 14 at ¶ 12 at 2.
[85] *Id.* at ¶ 18 at 13–14.
[86] *Id.* at ¶ 20 at 14.
[87] *Id.* at 2 of 7 (emphasis in original).
[88] D.I. 23-2, ex. 2 at 3.
[89] D.I. 14 at ¶ 13 at 13–¶ 19 at 14.
[90] D.I. 23-6, ex. 6.

Fresh's Counterclaims are based on exhibit 6, and the court may also consider this document in the motion to dismiss.

### B. Dismissal of Garden Fresh's Counterclaims

The gravamen of Garden Fresh's Counterclaims is its contention that the Beverage Consulting Agreement required Hiller to do an "assessment" of Garden Fresh's "current beverage program."  Garden Fresh alleges that "Hiller's assessment of Garden Fresh's soft drink program would [have] include[d], at a minimum, a rigorous and careful examination and analysis . . . of the historic beverage data, as well as to include consideration of Garden Fresh's current and anticipated future needs, and market trends."[91]  According to Garden Fresh, Hiller did not do that assessment, because it allegedly failed to subtract Dr. Pepper syrup volumes from the data it received from Garden Fresh and, thus, negotiated a deal with Pepsi that over-committed Garden Fresh to an unrealistic annual volume of Pepsi syrup.[92]

Hiller argues that the assessment discussed in the Beverage Consulting Agreement is in the recitations and is not a term of the contract.[93]  It avers that it was never obligated to conduct an assessment.[94]  In addition, Hiller contends that at no point was it obligated "to audit Garden Fresh's gallonage information or to probe whether 'Coke gallons' truly means what it says."[95]  Despite the lack of an obligation in the Beverage Consulting Agreement, Hiller argues, nonetheless, that it performed an assessment in February 2017, *before* it signed the Beverage Consulting Agreement.[96]

---

[91] D.I. 14 at ¶ 11 at 12.
[92] *Id.* at ¶ 18 at 13–¶ 19 at 14.
[93] D.I. 23 at 6–7.
[94] *Id.* at 7.
[95] *Id.* at 8–9.
[96] *Id.* at 10–12 (emphasis added); *see also* D.I. 2 at ¶ 12 at 4.  With regard to this argument, Hiller advocates for the court to consider exhibits 3–5 under the theory that "the absence of an assessment is 'integral to' Garden Fresh's counterclaims, [and thus] the documents reflecting Hiller's assessment should be considered in ruling upon a motion to dismiss those counterclaims."  *Id.* at 11 (citation omitted).  The court largely

In order to address the motion to dismiss, the court must first resolve the question of whether the alleged "assessment" is a term of the Beverage Consulting Agreement, and if so, whether Garden Fresh has pleaded facts sufficient to establish claims for breach of contract, fraudulent inducement, and negligent misrepresentation.

### 1.    The Beverage Consulting Agreement

The Beverage Consulting Agreement includes the following recitals:

> Whereas, [Hiller] is engaged in the business of providing soft drink consulting services to customers; and
>
> Whereas, the services provided by [Hiller] include an assessment of [Garden Fresh]'s current beverage program, and
>
> Whereas, [Garden Fresh] desires to utilize [Hiller]'s expertise and services with respect to establishing and/or modifying the soft drink program of [Garden Fresh]'s business.[97]

Standing alone, the recitals appear to state that the objective of the contract is that Hiller will use its expertise and services to "establish[] and/or modify[]" Garden Fresh's soft drink program.[98]  The services that Hiller provides include an "assessment" of Garden Fresh's "current beverage program[.]"[99]

Garden Fresh argues that the recital of services including an assessment, should be used to define "services" and should be read into the operative portion of the contract as an obligation for Hiller.[100]  The basis for this, according to Garden Fresh, is

---

agrees with Hiller that evidence of the assessment could contradict Garden Fresh's allegations.  However, Hiller ignores the underlying dispute at hand, the authentication of exhibits 3–5, which Hiller did not bother to address until the reply brief, and not the implications of their existence.

[97] D.I. 2-1, ex. A at 1.

[98] *Id.*

[99] *Id.*

[100] D.I. 26 at 9 (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010) ("It is clear from the preceding language in the Consulting Agreement that the 'expertise and services' include an 'assessment of the Customer's current beverage program' and 'establishing and/or modifying the soft drink program of the Customer's business.'").

the premise cited by the Delaware Supreme Court in *Osborn ex rel. Osborn v. Kemp* that Delaware courts "will read a contract as a whole and [] will give each provision and term effect, so as not to render any part of the contract mere surplusage."[101]  However, there is no evidence that the parties considered the recitals to be "provisions" or "terms" of the Beverage Consulting Agreement.  In addition, Delaware courts take the view that "[r]ecitals are not a necessary part of a contract and can only be used to explain some apparent doubt with respect to the intended meaning of the operative or granting part of the instrument[.]"[102]

Viewed in the context of the entire agreement, including the two sections entitled "services" and "compensation," there is no doubt about the intended meaning of the operative part of the Beverage Consulting Agreement.  From the language of the Beverage Consulting Agreement, it is apparent that the parties intended to provide a mechanism for Hiller to "establish[] and/or modif[y]" Garden Fresh's "soft drink program[,]" by negotiating a new contract with either Coke or Pepsi.[103]  The court discusses these three operative components below.

First, under "services," Garden Fresh "hereby grants [Hiller] the *right and authority* to provide *expertise and services* to support [Garden Fresh] in the establishment and/or modification of its soft drink program(s)."[104]  This is a grant of express "right and authority" for Hiller to act on Garden Fresh's behalf, specifically "to provide expertise and services" with respect to Garden Fresh's soft drink program.[105]  However, as a grant of "right and authority" from Garden Fresh to Hiller, this language

---

[101] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010) (citation and internal quotation marks omitted) (cited by Garden Fresh in D.I. 26 at 9).

[102] *Stabler v. Ramsay*, 30 Del. Ch. 439, 449–50 (1948) (citations omitted); *see also United States v. Chrysler Corp.*, 1990 WL 127160, at *6 (D. Del. Aug. 28, 1990); *Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*, 654 F. Supp. 1419, 1441–42 (D. Del. 1987)

[103] D.I. 2-1, ex. A at 1.

[104] *Id.* (emphasis added).

[105] *Id.*

does not define which specific services Hiller is to use, nor does it obligate Hiller to perform specific tasks.[106]

Second, also under "services," Garden Fresh "agrees to provide [Hiller] with all relevant information including, but not limited to, all information regarding [Garden Fresh]'s current soft drink products, any funding provided for said products, as well as support premiums, marketing programs, etc."[107] As Garden Fresh alleges in its Counterclaims, Hiller would need this information in order to negotiate the best possible deal for Garden Fresh.[108] By making it Garden Fresh's responsibility to share the information, this term appears to give Hiller recourse if Garden Fresh does not share the information and Hiller is, therefore, unable to negotiate a deal for Garden Fresh.

Third, in return, Garden Fresh agreed to pay Hiller a flat fee for a renegotiated (new) deal with Coke and a variable fee for a Pepsi deal—payment is contingent on Garden Fresh choosing to sign a deal with either Coke or Pepsi.[109] There is no obligation for Garden Fresh to pay Hiller in the event that it chose not to accept the deals with either Coke or Pepsi, and there is no mechanism in the Beverage Consulting Agreement that requires Garden Fresh to sign any deal.[110] Presumably, Hiller agreed to this term with the understanding that, in order to get paid, it would likely need to

---

[106] *Id.*

[107] *Id.*

[108] D.I. 14 at¶ 12 at 13 ("Hiller could not . . . negotiate a new beverage contract for Garden Fresh without first evaluating Garden Fresh's existing beverage program[.]").

[109] D.I. 2-1, ex. A at 1 ("[Hiller] shall be paid for its services as follows (a) if a new Coke contract is chosen by [Garden Fresh] . . . OR (b) if [Garden Fresh] decides to accept a new agreement with Pepsi[.]"). It is important to note that Hiller cannot bind Garden Fresh to either contract—signing the contract with Coke or Pepsi is Garden Fresh's choice, and Garden Fresh has the ability, as is demonstrated by the facts in the Complaint, to ask Hiller to negotiate deals with both Coke and Pepsi and to choose one.

[110] *Id.* There is no obligation for Garden Fresh to pay Hiller for negotiating a deal with Dr. Pepper. *Id.*

adjust the negotiated deals to meet Garden Fresh's changing requirements during the time from negotiation to signing.[111]

Neither party has raised doubt about the intended meaning of the operative portions of the Beverage Consulting Agreement, including the "right and authority to provide expertise and services[.]" Absent this doubt, there is no reason for the court to rely upon the recitals to interpret the Beverage Consulting Agreement.[112] Therefore, the court concludes that the Beverage Consulting Agreement does not obligate Hiller to perform an "assessment" of Garden Fresh's "current beverage program."

### 2. Breach of Contract

#### (a) Legal Standard

"In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (footnote and citations omitted).

#### (b) Discussion

Garden Fresh's breach of contract counterclaim is deficient because Garden Fresh is unable to identify a breach of an obligation imposed by the Beverage

---

[111] The parties appear to have agreed that payment was sufficient motivation for Hiller to perform on the contract, because there are no operative portions of the Beverage Consulting Agreement in which Hiller agrees to perform tasks, produce work product, or deliver an outcome.

[112] *See supra* note 102. Even if the court were to consider the recitals and to read Hiller's "services" as including an "assessment of" Garden Fresh's "current beverage program[,]" no reading of the grant of "right and authority" to Hiller could obligate Hiller to specifically perform the "assessment" that Garden Fresh alleges should have been performed. In addition, Garden Fresh alleges that it expected that this alleged "assessment . . . would include, at a minimum, a rigorous and careful examination and analysis . . . of the historic beverage data, as well as to include consideration of Garden Fresh's current and anticipated future needs, and market trends." D.I. 14 at ¶ 11 at 12. The court does not reach the question of whether Garden Fresh's proposed definition satisfies the plain meaning of "assessment."

Consulting Agreement.  The counterclaim is based upon reading a term into the Beverage Consulting Agreement that the parties clearly chose not to include.  As a matter of law, therefore, Garden Fresh's breach of contract counterclaim is insufficient. Before moving to Garden Fresh's other counterclaims, for the sake of completeness, the court wishes to address Garden Fresh's factual basis for its claims.

### (c)  Garden Fresh's factual allegations

In several instances, Garden Fresh's factual allegations in its Counterclaims contradict statements that Garden Fresh made in the Answer.  More importantly, in view of exhibits 2 and 6, defendant's allegations in the Counterclaims are self-evidently false.

### (i)  Discrepancies between the Answer and Counterclaims

Garden Fresh contends that it lacks knowledge or information about Hiller's specific allegations in the Complaint but then, in the Counterclaims, makes allegations to the contrary, and represents to the court that its "factual contentions have evidentiary support or . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]"[113]

For example, Hiller alleges in the Complaint that it performed an assessment in February 2017, before it signed the Beverage Consulting Agreement.[114]  In the Answer, Garden Fresh responded that it "lack[ed] knowledge or information sufficient to form a belief as to the truth of [this] allegation[.]"[115]  Elsewhere, Garden Fresh claimed to "lack knowledge or information"[116] in response to the allegation that "[t]he specified number of syrup gallons in the Pepsi contract was calculated and agreed to by all parties involved and was based on gallonage information provided by Garden Fresh."[117]  Instead,

---

[113] Fed. R. Civ. P. 11(b)(3).  Defendant dedicates a substantial portion of its brief in opposition discussing its need for discovery.  D.I. 26 at 4–7.
[114] D.I. 2 at ¶ 13 at 4.
[115] D.I. ¶ 14 at ¶ 13 at 3.
[116] D.I. 14 at ¶ 24 at 5.
[117] D.I. 2 at ¶ 24 at 7.

"Garden Fresh denie[d] that it provided Hiller with projections of Coca-Cola product used[,]"[118] and in the Counterclaims, Garden Fresh alleges that it provided Hiller with "open access" to its staff and "historical beverage data[,]"[119] but that Hiller did an erroneous assessment based on this information.[120]

In the Answer, Garden Fresh essentially claims not to know anything about the information it shared with Hiller, the analysis Hiller performed, the information Hiller shared with individuals at Garden Fresh, and any feedback Garden Fresh may have given Hiller. At the same time, in the Answer, Garden Fresh explicitly denies that it shared forecast information with Hiller, and in the Counterclaim, Garden Fresh alleges with specificity that Hiller's analysis was erroneous, because it allegedly included historical Dr. Pepper volumes in the forecast for Pepsi commitments.

There are other contradictions as well—Garden Fresh contends that it did not discover what it contends is Hiller's material breach, in the form of the "gallonage error[,]" until October 2017.[121] However, in response to paragraph 29 of the Complaint, which alleges that Garden Fresh's Haywood contacted Hiller in September 2017 "to 'discuss a renegotiation of [Hiller's] fee[,]'"[122] Garden Fresh admits that Haywood "sought to discuss [] Hiller's fee in light of the *material breaches and errors* made by Hiller in performing its consulting services and negotiating the beverage sales agreement."[123] As Hiller notes, these allegations present a factual impossibility— Garden Fresh's Haywood could not contact Hiller to discuss the alleged breach in September, *a month before* Garden Fresh actually discovered the alleged breach.[124]

---

[118] D.I. 14 at ¶ 12 at 2.
[119] *Id.* at ¶ 9 at 12.
[120] D.I. 14 at ¶ 18 at 13–¶ 19 at14.
[121] D.I. 14 at ¶ 29 at 6.
[122] D.I. 2 at ¶ 29 at 9.
[123] D.I. 14 at ¶ 29 at 6 (emphasis added).
[124] D.I. 23 at 1.

### (ii)    Exhibits 2 and 6

Exhibits 2, and 6 are documents that relate directly to Garden Fresh's Counterclaims.  Exhibit 2 shows that, on February 9, 2017, Garden Fresh provided Hiller with answers to Hiller's questions about the number of Garden Fresh outlets open and the number of "Coke gallons" Garden Fresh restaurants consumed historically and projected—Garden Fresh estimated that it would have 95 outlets by the end of 2017 and would consume 145,000 "Coke gallons" systemwide in 2017.[125]  In addition, Garden Fresh corroborated its own historical data by providing Hiller with "scanned spread sheets with the detail of each [Coke program] funding by year[.]"[126]  Exhibit 2 also includes Garden Fresh's prior contract with Coke.[127]

Exhibit 6 is the contract with Pepsi that Hiller negotiated and that Garden Fresh signed in August 2017.[128]  In the Pepsi contract, Garden Fresh committed to purchase 711,541 gallons of Pepsi syrup (or 142,308 gallons/year) over a five-year period between June 19, 2017 and August 30, 2022.[129]  Taken together, these documents confirm that Hiller negotiated a contract with Pepsi based upon Garden Fresh's historical volumes of "Coke gallons" and Garden Fresh's own estimate of expected Coke volume (145,000 gallons) for 2017.  The negotiated Pepsi commitment of 142,308 gallons/year was set below this level, despite Garden Fresh's own projections that it would grow its number of outlets by 34 stores over the term of the Pepsi contract.[130]  In addition, the new contract represented no apparent change in Dr. Pepper consumption—Pepsi authorized Garden Fresh to sell Dr. Pepper on one valve of the

---

[125] D.I. 23-2, ex. 2 at 3 (emphasis in original) ("Total <u>Garden Fresh</u> system Coke gallons").
[126] *Id.* at 1; *see also id.* at 57–59.
[127] D.I. 23-2, ex. 2 at 1 ("Attached is the . . . coke contract with amend[]ments.").
[128] D.I. 23-6, ex. 6.
[129] *Id.* at 1.
[130] D.I. 23-2, ex. 2 at 3 (projecting the number of "net new stores to be opened (conservative please)").

fountain in each Garden Fresh outlet,[131] which is the same arrangement Garden Fresh had with Coke in its earlier contract.[132] Based upon the documentary evidence, it is evident that Garden Fresh's contract with Pepsi is not based on historical volumes of Dr. Pepper.

### (iii) Conclusion—factual allegations

In the case at bar, Garden Fresh's factual allegations supporting its breach of contract counterclaim are inconsistent with the statements Garden Fresh made in the Answer. In addition, the documentary evidence contradicts the Counterclaims. Thus, the Counterclaims present a series of "bald assertions[,]"[133] "unsupported conclusions and unwarranted inferences"[134] that the court is not obligated to accept as true.

### (d) Conclusion—Breach of Contract

Garden Fresh's breach of contract counterclaim is legally insufficient, because it is based on a term that is not part of the contract. In addition, the facts pleaded by Garden Fresh in its Answer and Counterclaim are inconsistent and contradictory, and, therefore, present an alternate ground for dismissal. For these reasons, the court recommends dismissal of defendant's Count I—the breach of contract counterclaim.[135]

---

[131] D.I. 23-6, ex. 6 at 2 ("Customer may offer Dr Pepper (regular flavor only) on 1 valve of Equipment as a fountain beverage in the Outlets during the Term[.]").

[132] D.I. 23-2, ex. 2 at 5 ("Franchisee may serve Dr Pepper on only one valve per dispenser[.]").

[133] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1429 (citations and internal quotation marks omitted).

[134] *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) ("We are not, however, required to accept as true unsupported conclusions and unwarranted inferences."); *cf. Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

[135] The parties dispute whether rescission is an available remedy for Garden Fresh's breach of contract counterclaim. D.I. 23 at 14–17; D.I. 26 at 12–13; D.I. 28 at 5–7. Having found no basis for a breach of contract claim, the court declines to consider these arguments.

### 3. Tort Claims

Garden Fresh alleges that Hiller fraudulently induced it to enter into the Beverage Consulting Agreement by misrepresenting that Hiller "would provide information to Garden Fresh in the form of an assessment[.]"[136] Alternatively, Garden Fresh alleges that the same facts also amount to negligent misrepresentation.[137]

Hiller has moved to dismiss these counterclaims and now argues: (1) Garden Fresh's tort claims are "based on the same alleged breach that forms the basis of its contract claim, and . . . [is] improperly 'bootstrapped' under Delaware law, (2) Garden Fresh could not plausibly have relied on Hiller's statements about "Garden Fresh's likely future beverage needs . . . as statements of present fact or guarantees about the future[,]" and (3) Garden Fresh's pleading does not satisfy the particularity required by Rule 9(b).[138]

Under Delaware law, "in order to assert a tort claim along with a contract claim, the plaintiff must generally allege that the defendant violated an independent legal duty, apart from the duty imposed by contract."[139] In the Counterclaims, Garden Fresh alleges in each of its tort claims that either "[i]n the Beverage Consulting Agreement"[140] or in order "[t]o induce Garden Fresh to enter into and compensate Hiller under the Beverage Consulting Agreement . . . , Hiller misrepresented that it would provide information to Garden Fresh in the form of an assessment of Garden Fresh's beverage program for Garden Fresh's use in negotiating a beverage contract with a third party."[141] In essence, Garden Fresh contends that the objective for Hiller's alleged

---

[136] D.I. 14 at ¶¶ 33–39 at 16.
[137] *Id.* at ¶¶ 41–48 at 17.
[138] D.I. 23 at 17.
[139] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009).
[140] D.I. 14 at ¶ 33 at 16.
[141] *Id.* at ¶ 42 at 17.

misrepresentation was for Garden Fresh to enter into the Beverage Consulting Agreement.[142]

In the fraudulent inducement claim, Garden Fresh alleges no other misrepresentations.  As to negligent misrepresentation, Garden Fresh alleges that Hiller "did not exercise reasonable care in communicating accurate information about Garden Fresh's *future soft drink needs* to Garden Fresh for use in Garden Fresh's business transaction with Pepsi. . . . [and i]n the transaction with Pepsi, Garden Fresh justifiably relied on Hiller's information."[143]  Hiller argues that "[a]ny projection by Hiller about 'Garden Fresh's future soft drink needs' was necessarily a predictive statement of opinion about what Hiller thought was likely to happen in the future, not a statement of present fact on which[, under Delaware law,] a misrepresentation claim can be based."[144]

In response, Garden Fresh makes two contradictory averments.  First, Garden Fresh contends that its "tort claims are based on false information Hiller provided to Garden Fresh (1) to induce Garden Fresh to enter the [Beverage] Consulting Agreement, and (2) for use in a business transaction with Pepsi."[145]  Second, Garden

---

[142] This is a confusing set of allegations.  For the fraudulent inducement claim, which requires pleading with particularity, *see* Fed. R. Civ. P. 9(b), Garden Fresh does not explain when, how, or in what context Hiller made the statement to Garden Fresh that was the alleged misrepresentation intended to induce Garden Fresh to sign the Beverage Consulting Agreement, D.I. 14 at ¶ 33 at 16.  Meanwhile, in the negligent misrepresentation claim, Garden Fresh alleges that the alleged misrepresentation that caused Garden Fresh to sign the Beverage Consulting Agreement was *in the contract itself.  Id.* at ¶ 42 at 17.

[143] *Id.* at ¶¶ 44–45 at 17 (emphasis added).

[144] D.I. 23 at 19 (citing *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2051) (footnotes and citations omitted) ("Predictions about the future cannot give rise to actionable common law fraud.  Nor can expressions of opinion."); *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 775 (Del. Ch. 2014) (footnotes and citations omitted) ("[T]he misrepresentation forming the basis for the fraud or negligent misrepresentation claim must be material, and the plaintiff generally cannot rely, for example, on puffery, expressions of mere opinion, or representations that are obviously false.")).

[145] D.I. 26 at 15.

Fresh also argues that its "claims are not based on opinions or predictions about future events, but upon Hiller's [alleged] misrepresentation that it would provide an expert assessment of Garden Fresh's beverage program."[146]  Essentially, Garden Fresh tries to spin the first alleged misrepresentation (that Hiller allegedly would perform an "assessment") into a second misrepresentation (that Hiller had allegedly performed an "assessment" on which Garden Fresh subsequently relied) without addressing the substance of the alleged assessment that Garden Fresh alleges was flawed in the first place.  Hiller argues that these two positions are a "shell game [that] fails to provide Hiller [with] adequate notice of what it is accused of, not to mention falling well short of satisfying Rule 9(b)."[147]  The court is inclined to agree.  Other than a single statement in the recitals of the Beverage Consulting Agreement, Garden Fresh has not identified any other statements by Hiller that comprise the alleged misrepresentations.[148]  Therefore, Garden Fresh's tort claims do not arise by operation of law and instead originate in the Beverage Consulting Agreement.[149]  For these reasons, the court recommends dismissal of defendant's Counts II and III, the fraudulent inducement and negligent misrepresentation claims.

### C.    Motion to Preclude

As discussed in Section III.B above, the court has resolved the motion to dismiss without considering exhibits 3–5.  Therefore, the court recommends that the motion to preclude be dismissed as moot.

---

[146] *Id.* at 17.

[147] D.I. 28 at 9; *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

[148] *E.g.*, D.I. 14 at ¶ 42 at 17 ("In the Beverage Consulting Agreement . . . Hiller [allegedly] falsely represented . . .").

[149] *E.g.*, *Diver v. Miller*, 34 Del. 207 (Del. Super. Ct. 1929) ("In order to constitute a tort there must always be a violation of some duty owed to the plaintiff; but generally speaking such a duty must arise by operation of law and not by the mere agreement of the parties.").

## IV.    CONCLUSION

For the reasons discussed herein, the court recommends that the district court GRANT plaintiff's motion to dismiss defendant's counterclaims, D.I. 22, and DENY as MOOT defendant's motion to preclude, D.I. 34.

Pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(a), Fed. R. Civ. P. 72 (b)(2), and D. Del. LR 72.1, any objections to the Report and Recommendation shall be filed within fourteen (14) days limited to ten (10) pages after being served with the same.  Any response shall be limited to ten (10) pages.

The parties are directed to the Court's Standing Order in Non-Pro Se Matters for Objections Filed under Fed. R. Civ. P. 72 dated October 9, 2013, a copy of which is found on the Court's website (www.ded.uscourts.gov.)

Dated:    August 9, 2018                         _____/s/ Mary Pat Thynge_____
                                                  Chief U.S. Magistrate Judge